IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH EDWARD KING, | No. CIV S-07-0830-CMK-P |
| Petitioner, | |
| vs. | MEMORANDUM OPINION AND ORDER |
| ROBERT HORELL, | |
| Respondent. | |
| _____/ | |

Petitioner, a state prisoner proceeding with appointed counsel, brings this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Pursuant to the written consent of all parties, this case is before the undersigned as the presiding judge for all purposes, including entry of final judgment. See 28 U.S.C. § 636(c). Pending before the court are petitioner's petition for a writ of habeas corpus (Doc. 1) and respondent's answer (Doc. 25).

/ / /

/ / /

/ / /

/ / /

/ / /

# I. BACKGROUND

A.  **Facts**[1]

The state court recited the following facts, and petitioner has not offered any clear and convincing evidence to rebut the presumption that these facts are correct:

> In August 2003, Demarkas [King], his wife Tamica, and their small daughter lived on Sky Parkway in Sacramento County. Ralph [King] and McClish lived in separate apartments at 5218 Martin Luther King Boulevard in the City of Sacramento, a bit north of Fruitbridge Road; McClish lived with his girlfriend Lisa Knestrict and her aunt Betty Patterson, among others. Ralph's and McClish's building was about 600 feet from a Taco Bell at the corner of Martin Luther King Boulevard and Fruitbridge Road; an open field separated the two buildings.
>
> On August 17, 2003, sheriff's deputies came to Demarkas's apartment in response to a call. Tamica said that Demarkas, who was not there, had been in a fight. Demarkas did not contact the authorities. He later told the police, however, that after he heard banging on his front door and opened it, Michael Washington and others burst in and beat him up, then left.
>
> According to Thomas Ogle, Jr., the 17-year-old stepbrother of Tamica, while visiting the King family in the summer of 2003 he saw Ralph buy a black semiautomatic handgun, then later show it to Demarkas. In a police interview Ogle said the purchase took place the weekend before the charged crimes, but he testified that it might have been around July 4 because he remembered the Kings had had a barbecue.
>
> According to Betty Patterson, on August 19, 2003, she overheard Demarkas and Ralph talking outside Ralph's building. Demarkas said the police had learned of the assault on him but did nothing. Ralph said he did not want his family treated like that.
>
> On the morning of August 20, 2003, Patterson overheard Demarkas and Ralph talk about getting a gun. Ralph told Demarkas: "We have one gun, and we need another one." Demarkas said he knew where to get another gun. Ralph said he would not let his family be disrespected, and Demarkas's attackers "didn't know who they were dealing with."
>
> Before August 20, 2003, Patterson heard McClish tell boys in the building that he had a gun; the boys later told Patterson they had seen it. McClish's girlfriend Lisa Knestrict testified that in July 2003 she discovered a black gun under the mattress on McClish's side of the bed and told him to get rid of it; he said he would. (footnote omitted).

---

[1] Pursuant to 28 U.S.C. § 2254(e)(1), ". . . a determination of a factual issue made by a State court shall be presumed to be correct." Petitioner bears the burden of rebutting this presumption by clear and convincing evidence. See id. These facts are, therefore, drawn from the state court's opinion(s), lodged in this court. Petitioner may also be referred to as "defendant."

2

At 10:21 p.m. on August 20, 2003, Demarkas called the sheriff's department from work to report that someone was kicking his apartment door while his wife was at home. The department responded to the call at 10:56 p.m., but found no evidence of a crime and left without filing a report.

According to Patterson, McClish told her on the night of August 20 that Demarkas had called and would come over. Demarkas arrived around 11:00 p.m. and asked Patterson if McClish was home. As Patterson sat on a bench outside, she overheard Demarkas tell Ralph that "the guys were at Taco Bell" and "[w]e need to get over there now." Demarkas went upstairs and came back down with McClish, who carried a gray sweatshirt rolled up under his arm. (footnote omitted). Patterson and Jermal Lee, a teenage resident of the building, saw Demarkas or Ralph walking with McClish at the rear of the building.

At around 11:30 p.m., Michael Washington and Allen Qualls were sitting in a primer-gray 1972 Chevrolet Nova in the Taco Bell drive-through at Martin Luther King Boulevard and Fruitbridge Road. Qualls was the driver, Washington the passenger.

Taco Bell employees and customers saw a man walk up to the Nova's passenger side, appear to speak, then pull out a black long-barreled gun and fire into the car. A second man was standing in the drive-through lane two cars behind the Nova. After pausing and looking back at him, the shooter fired more shots into the Nova. The two men then hopped over a concrete wall behind the restaurant.

Eyewitnesses subsequently identified the shooter in photo line-ups and in court as Demarkas. They could not identify the second man, but described him as a heavy-set Black man around 5 feet 8 or 9 inches tall; two witnesses said he was wearing light or khaki shorts. (footnote omitted).

The Nova pulled into a nearby gas station, where Qualls collapsed. Taken to University of California at Davis Medical Center, he was declared dead from a gunshot wound to the abdomen. Washington was operated on for lung damage from a gunshot that struck him in the back and shoulder.

Investigating officers found six spent shells near the drive-through window and a projectile and bullet fragments inside the Nova. Another projectile was removed from Washington during surgery. A ballistics expert opined that the shells and projectiles were fired from the same nine-millimeter gun, at least some while the Nova was moving forward. No weapons or ammunition were found in the Nova. (footnote omitted).

Betty Patterson and Jermal Lee, in separate positions outside their building, heard four or five shots from the direction of the Taco Bell. Patterson then saw three people climbing over a fence, heading toward the building from the nearby field. She recognized Ralph and Demarkas; the third, whose face she could not see, was wearing a gray sweatshirt like the one McClish had on when Patterson saw him in his bedroom soon after.

According to Patterson, Ralph took a handgun out of his waistband and unloaded some shells, while saying, "We do this gangsta style." Ralph then said he was going to have a drink to calm his nerves and headed to his apartment. In subsequent days he repeated that he would not let anyone disrespect his family.

3

Lee testified, as he had told an investigator for the district attorney's office, that after hearing shots he saw Ralph and McClish walking from the field toward the building, then saw Ralph unload the gun as he said, "They should not mess with my family." However, Lee also testified, as he had told McClish's former attorney, that McClish was with him outside the building when the shots were fired, and it was Ralph and Demarkas whom Lee saw coming toward the building.

After the shooting, Demarkas drove to Oakland, then to San Diego. He crossed the border into Mexico, but was arrested on a murder warrant as he tried to reenter the United States.

In custody, Demarkas was interviewed on videotape on August 28, 2003, by Sheriff's Detective Charles Husted. Portions of the interview were played for the jury.

During the interview, after claiming ignorance of the crimes, Demarkas admitted he shot Washington (who he called "Nova Mike") because he was "fed up" with Washington for threatening him and for assaulting him in his home. He had aimed only at Washington and did not know who else was in the Nova. he had gotten the nine-millimeter handgun from his father's home after spotting Washington driving past.

After Demarkas testified, the prosecution played other portions of his interview, which implicated the codefendants. Demarkas told Detective Husted that Ralph was standing at the concrete wall separating the Taco Bell from a day care center when Demarkas shot Washington, and McClish (whom Demarkas called "Uncle Ken") was in the drive-through area at the time. Ralph and McClish were present as Demarkas ran through the field to their building after the shootings; he gave the gun to Ralph en route. Demarkas knew McClish had a sawed-off .22-caliber rifle, but did not know if he had taken it to the Taco Bell.

The prosecution also played portions of a taped interview of Ralph made on August 23, 2003, the date of his arrest. Ralph claimed he was walking across the field trying to catch up to Demarkas when the shots were fired. But later Ralph admitted he had followed Demaraks to the wall behind the Taco Bell, pulled himself up to look over it, and seen Demarkas standing by the Nova. Ralph saw Demarkas extend his arm toward the Nova, then heard three or four shots.

After the interview, Ralph and Detective Husted went to the field and Ralph pointed out where he had climbed the fence. He also pointed out a water pipe he had stood on at the base of the seven-foot-high concrete wall, allowing him to peer over its top.

\* \* \*

Ralph did not testify, but tried to prove he did not participate in the crimes and could not have done so.

A chiropractor who treated Ralph for a back injury incurred on July 23, 2003, testified that Ralph had "moderate to severe problems" with movement. (The parties stipulated that Ralph had also undergone back surgery following a workplace injury 20 years before). The chiropractor conceded, however that thanks to his treatments Ralph "most likely" could have climbed a five-foot-high fence by August 20, 2003.

Ralph's girlfriend testified she spent the evening of August 20, 2003, with him, celebrating her birthday and helping him unpack in the new apartment he had just moved into from another one in the building. According to her, he got a phone call and left his apartment around 10:30 p.m., then returned 30 to 45 minutes later; however, she never saw him with a gun that night.

### B. Procedural History

Petitioner, his son Demarkas King, and Kenneth McClish were found guilty following a jury trial of second degree murder of Qualls and attempted murder of Washington. The jury also found true that petitioner and McClish were felons in possession of a firearm and that all defendants were armed during the commission of the offense. All defendants were sentenced to indeterminate life terms in state prison. The California Court of Appeal affirmed the convictions and sentences on direct appeal. The Court of Appeal denied rehearing and the California Supreme Court denied review. Petitioner did not file any state post-conviction actions. Respondent concedes the instant federal petition is timely. Respondent also concedes that petitioner's claims relating to the sufficiency of the evidence are exhausted. Respondent argues that petitioner's claims relating to cruel and unusual punishment and instructional error are unexhausted, but waives the exhaustion defense as to the cruel and unusual punishment claim.

## II. STANDARDS OF REVIEW

Because this action was filed after April 26, 1996, the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") are presumptively applicable. See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Calderon v. United States Dist. Ct. (Beeler), 128 F.3d 1283, 1287 (9th Cir. 1997), cert. denied, 522 U.S. 1099 (1998). The AEDPA does not, however, apply in all circumstances. When it is clear that a state court has not reached the merits of a petitioner's claim, because it was not raised in state court or because the court denied it on procedural grounds, the AEDPA deference scheme does not apply and a federal

habeas court must review the claim de novo. See Pirtle v. Morgan, 313 F.3d 1160 (9th Cir. 2002) (holding that the AEDPA did not apply where Washington Supreme Court refused to reach petitioner's claim under its "re-litigation rule"); see also Killian v. Poole, 282 F.3d 1204, 1208 (9th Cir. 2002) (holding that, where state court denied petitioner an evidentiary hearing on perjury claim, AEDPA did not apply because evidence of the perjury was adduced only at the evidentiary hearing in federal court); Appel v. Horn, 250 F.3d 203, 210 (3d Cir.2001) (reviewing petition de novo where state court had issued a ruling on the merits of a related claim, but not the claim alleged by petitioner).  When the state court does not reach the merits of a claim, "concerns about comity and federalism . . . do not exist." Pirtle, 313 F. 3d at 1167.

Where AEDPA is applicable, federal habeas relief under 28 U.S.C. § 2254(d) is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Under § 2254(d)(1), federal habeas relief is available only where the state court's decision is "contrary to" or represents an "unreasonable application of" clearly established law. Under both standards, "clearly established law" means those holdings of the United States Supreme Court as of the time of the relevant state court decision. See Carey v. Musladin, 549 U.S. 70, 74 (2006) (citing Williams, 529 U.S. at 412) . "What matters are the holdings of the Supreme Court, not the holdings of lower federal courts." Plumlee v. Masto, 512 F.3d 1204 (9th Cir. 2008) (en banc). Supreme Court precedent is not clearly established law, and therefore federal habeas relief is unavailable, unless it "squarely addresses" an issue. See Moses v. Payne, 555 F.3d 742, 753-54 (9th Cir. 2009) (citing Wright v. Van Patten, 552 U.S. 120, 28 S. Ct. 743, 746 (2008)). For federal law to be clearly established, the Supreme Court must provide a "categorical answer"

to the question before the state court. See id.; see also Carey, 549 U.S. at 76-77 (holding that a state court's decision that a defendant was not prejudiced by spectators' conduct at trial was not contrary to, or an unreasonable application of, the Supreme Court's test for determining prejudice created by state conduct at trial because the Court had never applied the test to spectators' conduct). Circuit court precedent may not be used to fill open questions in the Supreme Court's holdings. See Carey, 549 U.S. at 74.

In Williams v. Taylor, 529 U.S. 362 (2000) (O'Connor, J., concurring, garnering a majority of the Court), the United States Supreme Court explained these different standards. A state court decision is "contrary to" Supreme Court precedent if it is opposite to that reached by the Supreme Court on the same question of law, or if the state court decides the case differently than the Supreme Court has on a set of materially indistinguishable facts. See id. at 405. A state court decision is also "contrary to" established law if it applies a rule which contradicts the governing law set forth in Supreme Court cases. See id. In sum, the petitioner must demonstrate that Supreme Court precedent requires a contrary outcome because the state court applied the wrong legal rules. Thus, a state court decision applying the correct legal rule from Supreme Court cases to the facts of a particular case is not reviewed under the "contrary to" standard. See id. at 406. If a state court decision is "contrary to" clearly established law, it is reviewed to determine first whether it resulted in constitutional error. See Benn v. Lambert, 283 F.3d 1040, 1052 n.6 (9th Cir. 2002). If so, the next question is whether such error was structural, in which case federal habeas relief is warranted. See id. If the error was not structural, the final question is whether the error had a substantial and injurious effect on the verdict, or was harmless. See id.

State court decisions are reviewed under the far more deferential "unreasonable application of" standard where it identifies the correct legal rule from Supreme Court cases, but unreasonably applies the rule to the facts of a particular case. See Wiggins v. Smith, 539 U.S. 510, 520 (2003). While declining to rule on the issue, the Supreme Court in Williams, suggested that federal habeas relief may be available under this standard where the state court either

unreasonably extends a legal principle to a new context where it should not apply, or unreasonably refuses to extend that principle to a new context where it should apply. See Williams, 529 U.S. at 408-09. The Supreme Court has, however, made it clear that a state court decision is not an "unreasonable application of" controlling law simply because it is an erroneous or incorrect application of federal law. See id. at 410; see also Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003). An "unreasonable application of" controlling law cannot necessarily be found even where the federal habeas court concludes that the state court decision is clearly erroneous. See Lockyer, 538 U.S. at 75-76. This is because "[t]he gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness." Id. at 75. As with state court decisions which are "contrary to" established federal law, where a state court decision is an "unreasonable application of" controlling law, federal habeas relief is nonetheless unavailable if the error was non-structural and harmless. See Benn, 283 F.3d at 1052 n.6.

### III. DISCUSSION

Petitioner claims: (1) the evidence was insufficient to support his conviction for second degree murder; and (2) the sentence constitutes cruel and unusual punishment. Petitioner also argues in the context of his claims of insufficient evidence that the trial court committed instructional error because "the jury can't be impartial when the jury instructions or [sic] only in favor of the prosecutor."

**A.** **Sufficiency of the Evidence**

When a challenge is brought alleging insufficient evidence, federal habeas corpus relief is available if it is found that, upon the record of evidence adduced at trial, viewed in the light most favorable to the prosecution, no rational trier of fact could have found proof of guilt

beyond a reasonable doubt.  See Jackson v. Virginia, 443 U.S. 307, 319 (1979).[2]  Under Jackson, the court must review the entire record when the sufficiency of the evidence is challenged on habeas.  See id.  It is the province of the jury to "resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts."  Id.  "The question is not whether we are personally convinced beyond a reasonable doubt.  It is whether rational jurors could reach the conclusion that these jurors reached."  Roehler v. Borg, 945 F.2d 303, 306 (9th Cir. 1991);  see also Herrera v. Collins, 506 U.S. 390, 401-02 (1993).  The federal habeas court determines sufficiency of the evidence in the context of the substantive elements of the criminal offense, as defined by state law.  See Jackson, 443 U.S. at 324 n.16.

In cases where the jury is presented with alternate bases for criminal liability under a single theory (i.e., first degree murder based either on torture or premeditation), insufficient evidence as to one basis does not warrant reversal as long as the evidence is sufficient as to any other basis.  See Griffin v. United States, 502 U.S. 46, 59 (1991).  Insufficient evidence on one basis for liability, however, would require reversal of the entire conviction if one of the bases of liability was legally inadequate because "there is no reason to think that [the jury's] own intelligence and expertise will save them from . . . error."  Id. at 59.  A claim of insufficiency of the evidence generally goes to factual, as opposed to legal, adequacy and "jurors are well equipped to analyze the evidence . . . ."  Id. (emphasis in original); cf. Zant v Stephens, 462 U.S. 862, 880-84 (1983) (refusing to set aside a capital conviction because one of the alleged aggravating circumstances was found to be unconstitutionally vague because the jury made specific findings as to other, legally and factually adequate aggravating circumstances).

---

[2]  Even though Jackson was decided before AEDPA's effective date, this expression of the law is valid under AEDPA's standard of federal habeas corpus review.  A state court decision denying relief in the face of a record establishing that no rational jury could have found proof of guilt beyond a reasonable doubt would be either contrary to or an unreasonable application of the law as outlined in Jackson.  Cf. Bruce v. Terhune, 376 F.3d 950, 959 (9th Cir. 2004) (denying habeas relief on sufficiency of the evidence claim under AEDPA standard of review because a rational jury could make the finding at issue).

1	As to petitioner's claims relating to sufficiency of the evidence, the state court set
2	forth the following discussion:

3	  Ralph contends he was denied due process of law under the
Fourteenth Amendment to the federal Constitution because there is
4	insufficient evidence to support his convictions for the second degree
murder of Allen Qualls and the attempted murder of Michael Washington.
5	Citing *People v. Young* (2005) 34 Cal.4th 1149, 1175 (*Young*), he states
(italics added by Court of Appeal): "[T]he standard of review requires this
6	Court to resolve all conflicts in the evidence in favor of guilt *and then
determine if each element has been proven beyond a reasonable doubt . . .*
7	*Under this standard, the issue on appeal is whether the prosecution
proved beyond a reasonable [doubt]* that Ralph King aided and abetted
8	the second degree murder and attempted murder committed by Demarkas
when he shot into the occupied vehicle."
9	  Ralph's assertion, which does not derive from *Young*, *supra*, 34
Cal.4th 1149, misstates the standard of review. This court does not
10	"determine" de novo whether the prosecution proved each element of the
offense beyond a reasonable doubt. Under both the federal due process
11	clause and the California Constitution, "the issue on appeal" is simply
"'whether, after viewing the evidence in the light most favorable to the
12	prosecution, *any* rational trier of fact could have found the essential
elements of the crime beyond a reasonable doubt.' [Citations]." (citation
13	omitted). In other words, does substantial evidence support the jury's
finding that the prosecution met its burden? (citations omitted). We
14	conclude it does.
  The prosecutor argued the jury could find Ralph guilty on both
15	counts as an aider and abettor, either because he shared Demarkas's intent
to kill Washington (and, by transferred intent, Qualls) or to shoot at him
16	with conscious disregard for human life, or because he shared Demarkas's
intent to shoot into the Nova to scare or send a message to Washington, or
17	because he conspired with Demarkas and McClish to have Demarkas
discharge a firearm at an occupied motor vehicle or with gross negligence.
18	We find substantial evidence supports the first theory, and therefore need
not address the others.
19	  Second degree murder can be based on express malice, the intent to
kill a human being unlawfully, or implied malice, the intent to commit an
20	act whose natural consequences are dangerous to human life with
knowledge of the danger and conscious disregard for human life.
21	(citations omitted). The trial court so instructed the jury pursuant to
CALJIC Nos. 8.11 and 8.31; the court also instructed on transferred intent
22	pursuant to CALJIC No. 8.65.
  A person may be a principal in a crime as an aider and abettor even
23	if he did none of the criminal acts, provided he (1) knew of the
perpetrator's unlawful purpose, (2) intended to commit, encourage, or
24	facilitate the commission of the crime, and (3) by act or advice aided,
promoted, encouraged, or instigated its commission. (citations omitted).
25	  "The 'act' required for aiding and abetting liability need not be a
substantial factor in the offense." (citation omitted). Nor is *advance*
26	knowledge required. "'Aiding and abetting may be committed "on the

spur of the moment," that is, as instantaneously as the criminal act itself. [Citation].'" (citation omitted).

To determine whether a person acted as an aider and abettor, we may consider, among other factors, "'presence at the scene of the crime, companionship, and conduct before and after the offense." [Citation]." (citation omitted). Whether a person aided and abetted a crime is a question of fact, and we resolve all evidentiary conflicts and reasonable inferences in favor of the judgment. (citation omitted).

Considered most favorably to the judgment, substantial evidence shows Ralph procured the gun used by Demarkas with the intent that Demarkas use it against Washington and his associates. Thomas Ogle told the police that he saw Ralph buy a black semiautomatic handgun, the kind Demarkas used in the crimes, perhaps as close in time to the shootings as the weekend before; he also testified he saw Ralph show it to Demarkas. (footnote omitted). Demarkas consistently said he obtained the gun he used from Ralph's apartment. Demarkas's wife testified that Ralph told her after the crimes he had handed Demarkas a gun.

Demarkas testified he told Ralph of the August 17 assault by Washington and his "partner" immediately after it happened, and Betty Patterson testified that she heard Ralph tell Demarkas those people "didn't know who they were dealing with." Patterson also testified that on the morning of the crimes Ralph told Demarkas they had one gun and needed another. Demarkas's wife testified that according to Demarkas, Ralph had advised him before the crimes: "You got to do what you got to do." Drawing all reasonable inferences in favor of the judgment, this is substantial evidence that Ralph instigated and encouraged Demarkas to seek violent revenge against his attackers. Likewise, Ralph's remark after the shootings as he unloaded the gun – "we do this gangsta style" – is consistent with the inference he knew beforehand what crimes "we" had intended to commit. (citation omitted).

Furthermore, substantial evidence showed that Ralph accompanied Demarkas and McClish to the Taco Bell (not merely "halfway across the field," as Ralph asserts) and watched as Demarkas did the crimes. In other words, having instigated and encouraged Demarkas to seek out Washington, Ralph lent his "presence at the scene of the crime" and "companionship" to bolster Demarkas's resolution in carrying out the crimes. (citation omitted).

Finally, Ralph's taking of the gun from Demarkas and unloading it after the crime, his repeated statements after the crime that he would not let anyone disrespect his family, and the help he provided Demarkas in making his getaway all constitute "conduct . . . after the offense" (citation omitted) which the jury could consider in light of all the other evidence as tending to prove Ralph's liability for aiding and abetting.

Arguing to the contrary, Ralph impermissibly reweighs the evidence in his own favor. As to every point we have mentioned, Ralph would have us either reject the strongest evidence against him as incredible or draw the most innocuous possible inference from it.

Thus, for instance, he asserts: "Ralph may have offered some support to Demarkas five weeks before he was beaten and six weeks before the shooting by buying a gun for his to use, but Ralph told the police that his only intent at any time wanted [sic] to help his son protect

> his family and stop his son from fighting." in other words, he first asks us to reject the evidence that he bought the gun far closer in time to the shooting, then asks us to credit his self-serving explanation for his conduct. (footnote omitted). Applying substantial-evidence review, we may not do either. Ralph also asserts: "Demarkas could not have formed his intent to shoot into Washington's car and his intent to kill Washington until he saw the car in the Taco Bell parking lot. Ralph could not have had knowledge of Demarkas's criminal purpose until that moment. Ralph engaged in no act of encouragement or support between the time Demarkas exclaimed that Washington's car was at the Taco Bell and when the shooting occurred." Demarkas's exact method of taking his revenge was improvised on the spur of the moment, but the jury could reasonably have concluded that Ralph knew and encouraged Demarkas's intent to use a gun against Washington at the earliest opportunity, and once it materialized Ralph lent further support and encouragement by accompanying Demarkas to and from the crime scene. The prosecution did not need to prove Ralph and Demarkas had planned for all possible contingencies; it merely needed to prove Ralph intended to and did aid and abet Demarkas whenever the opportunity arose to take Washington lethally by surprise. (citation omitted).
>
> Finally, Ralph cites several decisions for their supposed illustrative value. however, since aiding and abetting is a question of fact (citation omitted), its resolution turns on the facts of the given case, and unrelated cases are of little assistance.
>
> Substantial evidence supports Ralph's convictions. . . .

At the outset, the court notes, as did the Court of Appeal, that petitioner's claim of insufficient evidence is based on a fundamental misunderstanding of the applicable legal principles. Specifically, petitioner contends that the reviewing court must determine whether the evidence proved the elements of the charged offenses beyond a reasonable doubt. As outlined above, this is not the correct standard. Instead, the reviewing court looks to see if the evidence could support a reasonable juror's conclusion that the evidence meets the standard of proof. The standard petitioner advocates puts on its head the firmly established rule of law that it is for the jury, not a judge, to decide the facts and what is believed and what is not believed. Only the jury can say whether the evidence establishes guilt beyond a reasonable doubt.

Applying the correct standard to this case, the court concludes that the state court's decision was not an unreasonable application of the law or based on an unreasonable determination of the facts. Here, the Court of Appeal concluded that the evidence was sufficient for the jury to determine that petitioner was an aider and abettor to Demarkas' crime of killing

Qualls and attempting to kill Washington. First, there was sufficient evidence that petitioner obtained the gun used in the crimes. Thomas Ogle testified that he saw petitioner buy a gun that matched the description of the gun used by Demarkas. Ogle also said he saw petitioner show the gun to Demarkas, thus providing sufficient evidence that Demarkas knew about the gun. This is also consistent with Demarkas' testimony that he obtained the gun he used from petitioner's apartment and Demarkas' wife's testimony that petitioner told her he gave Demarkas the gun. The evidence also shows that petitioner knew of the August 17th assault by Washington and his associates. Demarkas testified that he told petitioner about the incident and Betty Patterson stated that she heard petitioner tell Demarkas that Washington and his associates "didn't know who they were dealing with." Further, the evidence indicates that, before the crimes, petitioner told Demarkas: "You got to do what you got to do." And, after the shootings, petitioner said "we do this gangsta style."

From all this, the jury could reasonably conclude that: (1) petitioner knew about the assault by Washington and others on Demarkas; (2) petitioner obtained a gun and gave it to Demarkas; (3) petitioner told Demarkas he had to "do what you got to do"; (4) after the shootings, petitioner said that "we" had done it "gangsta style"; and (5) the "we" petitioner was referring to was Demarkas and petitioner, and what they did "gangsta style" was shoot at Washington and Qualls in the Nova at the Taco Bell. Also based on petitioner's statement after the shootings that "we do this gangsta style," the jury could have reasonably concluded that petitioner was in fact present at the Taco Bell drive-through with Demarkas (and McClish), thereby lending his presence and companionship to bolster Demarkas' resolve to shoot into the Nova. Based on the foregoing, the court agrees with the state court that the evidence was sufficient to allow any reasonable jury to conclude that the prosecution had proved each of the elements of the charged offenses via the theory of transferred intent.

///

///

### B. Cruel and Unusual Punishment

In Lockyer v. Andrade, the Supreme Court concluded that habeas relief was not available on a claim that two consecutive sentences of 25 years to life in prison constituted cruel and unusual punishment because there is no clearly established Supreme Court precedent. See 538 U.S. 63, 72. The Court stated:

> Our cases exhibit a lack of clarity regarding what factors may indicate gross disproportionality. . . . [¶] Thus . . . the only relevant clearly established law amenable to the "contrary to" or "unreasonable application of" framework is the gross disproportionality principle, the precise contours of which are unclear, applicable only in the "exceedingly rare" and "extreme" case.

Id. at 72-73.

Thus, unless the case presents the "exceedingly rare" or "extreme" situation, application of the gross disproportionality principle is unclear and, for this reason, habeas relief is not available. Cf Gonzalez v. Duncan, _ F.3d _ (9th Cir. Dec. 30, 2008) (applying the gross disproportionality principle to term of years sentence to grant habeas relief only because the case presented the "exceedingly rare" and "extreme" situation).

The court finds that this case does not present the exceedingly rare and extreme case to which the gross disproportionality principle could be applied. Petitioner was convicted of attempted murder, second degree murder, and was also found to be a felon in possession of a firearm and to have been armed during the commission of the offenses. For these crimes petitioner received a sentence of 24 years to life in state prison. This is the typical kind of sentence one would expect to see for these crimes. In Rummel v. Estelle, the Supreme Court upheld an indeterminate life sentence where the defendant had obtained $125.70 by false pretenses and had two prior serious felony convictions. See 455 U.S. 263, 285 (1980). In Harmelin v. Michigan, the Court upheld an indeterminate life sentence where the defendant possessed 650 grams of cocaine. See 501 U.S. 957, 1009 (1983). And in Ewing v. California, the Court rejected an Eighth Amendment argument where the defendant had been sentenced to

1  25 years to life for grand theft with prior serious felony convictions.  See 538 U.S. 11, 30-31

2  (2003).  If the sentences and facts in Rummel, Harmelin, and Ewing did not present the

3  exceedingly rare situation in which gross disproportionality could be found, then neither does the

4  case at bar.

5       **C.**     **Instructional Error**

6       As part of his claims of insufficient evidence, petitioner argues:

7         . . . Plaintiff believe that the trial court did violate his Sixth
       Amendment right under the United States Constitution to have a impartial
8         jury.  The Plaintiff believe that the jury can't be impartial when the jury
       instructions or only in the favor of the prosecutor.
9

10  Petitioner thus appears to claim instructional error.  Petitioner's claim, however, is conclusory in

11  that he does not identify any specific instructions.  As respondent notes, conclusory allegations

12  do not state a prima facie claim for habeas corpus relief.  See James v. Borg, 24 F.3d 20, 26 (9th

13  Cir. 1994).

14

15                          **IV.  CONCLUSION**

16       Pursuant to Rule 11(a) of the Federal Rules Governing Section 2254 Cases, the

17  court has considered whether to issue a certificate of appealability.  Before petitioner can appeal

18  this decision, a certificate of appealability must issue.  See 28 U.S.C. § 2253(c); Fed. R. App. P.

19  22(b).  Where the petition is denied on the merits, a certificate of appealability may issue under

20  28 U.S.C. § 2253 "only if the applicant has made a substantial showing of the denial of a

21  constitutional right."  28 U.S.C. § 2253(c)(2).  The court must either issue a certificate of

22  appealability indicating which issues satisfy the required showing or must state the reasons why

23  such a certificate should not issue.  See Fed. R. App. P. 22(b).  Where the petition is dismissed

24  on procedural grounds, a certificate of appealability "should issue if the prisoner can show:

25  (1) 'that jurists of reason would find it debatable whether the district court was correct in its

26  procedural ruling'; and (2) 'that jurists of reason would find it debatable whether the petition

states a valid claim of the denial of a constitutional right.'" Morris v. Woodford, 229 F.3d 775, 780 (9th Cir. 2000) (quoting Slack v. McDaniel, 529 U.S. 473, 120 S.Ct. 1595, 1604 (2000)). For the reasons set forth above, the court finds that issuance of a certificate of appealability is not warranted in this case.

Accordingly, IT IS HEREBY ORDERED that:

1. Petitioner's petition for a writ of habeas corpus (Doc. 1) is denied;

2. The Clerk of the Court is directed to enter judgment and close this file.

DATED: September 29, 2010

_____
**CRAIG M. KELLISON**
UNITED STATES MAGISTRATE JUDGE